# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| LORI VAUGHN, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )  No. 3:15-CV-00228 |
| | )       REEVES/SHIRLEY |
| PARKWEST MEDICAL CENTER, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Lori Vaughn brings this action against her former employer, Parkwest Medical Center. Vaughn suffered two work-related injuries during her employment and was terminated by Parkwest after exhausting leave under the Family Medical Leave Act (FMLA). Vaughn alleges that Parkwest discriminated against her in violation of the Americans with Disabilities Act (ADA) by refusing to rehire her.[1] The parties have filed cross-motions for summary judgment.

Vaughn contends that Parkwest failed to consider her for vacant nursing positions and failed to engage in an interactive process to determine whether reasonable accommodations could be made to allow her to return to work as a nurse at Parkwest.

---

[1] Vaughn's claims for retaliation under Tennessee common law and the Tennessee Public Protection Act have been dismissed. Her FMLA retaliation claim has also been dismissed. The only remaining claim is disability discrimination under the ADA.

Parkwest contends that Vaughn was not qualified to perform the essential functions of the nursing jobs she applied for at Parkwest. Further, because Vaughn failed to request a reasonable accommodation, Parkwest had no obligation to participate in an interactive process.

## I. Statement of Facts

Vaughn started at Parkwest in 2003 as a student nurse associate and, after receiving a nursing degree, became a Clinical Nurse I. She was assigned to the Cardiology/Renal/Pulmonology unit on the third floor of Montvue Tower (3 Montvue) at Parkwest. Her average day involved caring for five to six patients, medication pass, assisting patients to the bathroom, feeding and turning patients, filling other patient needs, charting, and reporting. All nurses at Parkwest, both Clinical and LPNs, must meet Type A Physical Requirements, which necessitate frequent bending, walking, sitting, and standing 33% or more of the time as well as lifting up to 50 pounds occasionally, 20 pounds frequently, and 10 pounds regularly.

In 2005, Vaughn hurt her back helping move a patient. She was treated by Dr. Paul Johnson for lumbar strain and was released without restrictions to return to work. Dr. Johnson assigned Vaughn a 5% permanent impairment and she received a lump sum settlement of $12,505.80 as part of a workers' compensation claim in 2006.

Vaughn continued to work on 3 Montvue and became a Shift Leader. In 2010, Vaughn was asked to step down from the Shift Leader role because of concerns about her leadership. Instead of stepping down, Vaughn transferred to LeConte Medical Center effective June 13, 2010.

Six months after transferring to LeConte, Vaughn injured her neck and back on December 29, 2010, when a chair went out from under her. Dr. Johnson diagnosed her with right-sided disc herniations at C4 and C5-6 as well as an aggravation of her previous lumbar strain. Vaughn continued working at LeConte and advanced to a Clinical Nurse III in the Critical Care Unit.

Vaughn returned to Parkwest on September 17, 2012, performing the same duties as she had previously on 3 Montvue. Two months after returning to Parkwest, Vaughn took FMLA leave on November 27, 2012 for a hysterectomy. Three days after returning from surgery, Vaughn left to get surgery for her neck on January 14, 2013. She was released on March 12, 2013 with temporary restrictions of "no climbing, pulling, pushing, repetitive stooping, bending, no lifting more than 10 pounds." Vaughn could not work as a nurse with these restrictions but briefly worked a desk job at Fort Sanders Medical Center. Since she had not been released to return to work without restrictions and didn't have a follow-up appointment with Dr. Johnson until May 14, Parkwest terminated Vaughn's employment on March 22, 2013. Vaughn had exhausted all available FMLA leave plus an additional 30 days of personal leave. Parkwest notified Vaughn she would be eligible for rehire if released to return to work.

Seven months after her termination, Dr. Johnson released Vaughn without any work restrictions as to her cervical spine on October 22, 2013. Dr. Johnson also assigned Vaughn a 7% permanent anatomical impairment. While she was out of work, Vaughn received $33,800.43 in temporary total disability benefits from January 14, 2013 through October 22, 2013.

On the day of her release, Vaughn submitted applications for two Clinical Nurse III jobs at Parkwest, including one in the Emergency Department. These jobs had the same Type A Physical Requirements as her previous position as a Clinical Nurse III on 3 Montvue. Vaughn interviewed for the Emergency Department job on November 12, 2013. According to Vaughn, at the time of her interview, Department Manager, Tammy Wood, said she wanted to hire Vaughn, discussed pay with her, and told her she would hear from somebody in Human Resources. Wood does not remember the interview, but stated that she did not have authority to extend an offer of employment. Vaughn didn't get the Emergency Department job, but Parkwest offered her a Clinical Nurse III position on 3 Montvue on January 27, 2014. In response to the offer, Vaughn stated she wanted to check with Dr. Johnson before accepting the position. Randall Carr, HR Director for Parkwest, advised her the offer would not be open long because the hospital needed to fill the position.

Vaughn emailed Carr two days later, saying she had missed a January 28th doctor's appointment and had rescheduled the appointment for February 18th. Vaughn went on to state that at her last appointment with Dr. Johnson, he stated it would be best if she did not work as a floor nurse, and she wanted to clarify with him if it would be advisable to return to work as a floor nurse. Vaughn wrote that she would contact Carr following her next appointment with the doctor.

Later that same day, Vaughn applied for two other Clinical Nurse III jobs at Parkwest with the same Type A Physical Requirements as the 3 Montvue job. After applying for the jobs, Vaughn emailed Carr a second time stating she had applied for the

4

jobs and was interested in either of the two positions. She did not give Carr an answer about the 3 Montvue job.

The next day Vaughn requested a note from Dr. Johnson's nurse stating that it would not be in her best interests to go back to floor nursing. She received a note dated January 30, 2014, stating back pain would prevent her from working as a floor nurse. When Dr. Johnson was asked whether he told Vaughn it would be best not to return to work as a floor nurse, he testified that she clearly had restrictions which "probably don't qualify her to return to work as a floor nurse." He further opined that as a floor nurse, she would have to lift more than fifty pounds: "If you have to sheet slide a patient, even with a coworker, you've got to be – you've got to limit your patient's weight to a hundred pounds, and last I checked, most inpatients are at least double a hundred pounds." Dr. Johnson stated that even if Vaughn's functional capacity lifting restrictions fit within the Type A Physical Requirements, floor nurses are asked to move and position patients that are greater than fifty pounds. It was his opinion that Vaughn could not return to work as a floor nurse.

Three weeks after she was offered the job on 3 Montvue, Vaughn settled her two pending workers' compensation claims on February 18, 2014. One claim was for reconsideration of her 2005 lumbar strain at Parkwest, and her second claim arose out of her 2010 injury at LeConte. Vaughn, through her attorney, represented to the Tennessee Department of Labor that she had been unable to find employment within restrictions previously identified by Dr. Johnson and did not think she could return to a nursing job on the floor or in the ICU. Because she had not returned to work, Vaughn settled the workers' compensation claim relating to her neck injury for $82,804.24. The amount paid to Vaughn

5

to settle her 2010 claim equates to almost four times the 7% permanent partial impairment rating assigned to her by Dr. Johnson because she did not return to work at the same or greater rate of pay. If Vaughn had returned to work, she would have been limited to no more than 1.5 times her impairment rating. She also settled her reconsideration claim for the 2005 lumbar strain for $6,252.90 in additional permanent disability benefits because she had not returned to work at Parkwest.

On February 21, 2014, Mike Scales, Director of Employee Relations, emailed two nursing recruiters, requesting them not to send Vaughn's application for consideration if she applied for further nursing positions because her permanent partial disability ratings would preclude meeting the physical requirements for working as a floor nurse. Scales' email did not preclude Vaughn's application from being forwarded for other non-nursing positions. Vaughn continued to apply for nursing jobs at Parkwest.

Parkwest's Chief Nursing Officer, Lynn Cagle, testified "the ability to perform the duties of a floor nurse is an essential function of all nursing and nurse educator positions at Parkwest. Regardless of where a nurse works, (be it critical care, ortho-neuro, cardiac, labor and delivery, emergency department, patient services, or ambulatory staging), all nurses, including nurse educators, must be able to perform and work as a floor nurse as a fundamental part of their job." Likewise, a "nurse educator works at the bedsides of patients, and on the floor, ensuring new hires and existing nurses are competent in their duties and responsibilities. This requires a nurse educator to lift patients, move patients in bed, answer call lights, demonstrate procedures, and all other duties associated with nursing

6

care. Nurse educators also are required to work as floor nurses and accept direct patient assignments when the hospital is short staffed."

## II. Summary Judgment Standard

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.,* 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the court search the record "to establish that it is bereft

7

of a genuine issue of fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

### III. Analysis

To establish a *prima facie* case of disability discrimination, Vaughn must show (1) she was disabled, had a record of being disabled, or that her employer regarded her as having an impairment; (2) she was otherwise qualified for the job even if she needed an accommodation, (3) the employer took an adverse action against her, (4) the employer knew of her disability, her record of being disabled, or believed she had an impairment; and (5) the employer continued to seek other applicants after discarding her application. *Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312, 315 (6th Cir. 2012).

Vaughn avers she was qualified to serve as a floor nurse for at least one of the jobs for which she applied. To meet the *prima facie* test, Vaughn must show that she is qualified for the position. The term "qualified individual means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. Thus, if an individual's disability renders her unable to perform an essential function of her job, she is not a qualified individual protected by the non-discrimination provision of section 12112. In such an instance, the Act does not require an employer to continue employing the disabled employee, nor does

8

it require the employer to offer that employee an accommodation." *Wagner v. Sherwin-Williams Co.*, 647 Fed. Appx. 645, 647 (6th Cir. 2016).

Vaughn, herself, represented she could not work as a floor nurse. She told Carr that her doctor said it would be best if she didn't work as a floor nurse; she never responded to Parkwest's offer to return to work on 3 Montvue; and after applying for two other Clinical Nurse III jobs, she obtained a note from Dr. Johnson's office stating her back pain would prevent her from working as a floor nurse. The jobs Vaughn applied for at Parkwest all required her to work as a floor nurse.

Vaughn argues that her functional capacity lifting restrictions fit within the Type A Physical Requirements, but Dr. Johnson doubted the requirements take into account positioning and moving patients. Parkwest's Chief Nursing Officer testified the duties of a floor nurse are a fundamental duty of all nurses at Parkwest, regardless of their job title. Nurses, including nurse educators, may be called upon to lift patients, move patients in bed, answer call lights, demonstrate procedures, and other duties associated with nursing care.

Vaughn argues that floor nursing is not as strenuous in certain of the positions for which she applied, but she has failed to negate the evidence that the ability to work as a floor nurse is essential function of all nursing positions at Parkwest. Nor has she produced any evidence to negate the opinion of her treating physician, Dr. Johnson, that she could not work as a floor nurse in a hospital setting. Vaughn's argument that her functional capacity restriction fit within the Type A Physical requirements is also negated by Dr. Johnson's testimony that a floor nurse must be able to move and position patients that are

9

greater than 50 pounds. Vaughn testified help with lifting was minimal on 3 Montvue. Even though there was lifting equipment to lift patients out of bed and into a chair, it didn't pull them up in bed or turn them. She further testified it was always very hard to get someone to help lift and turn a patient. Since Vaught could not work as a floor nurse, she was not qualified for any of the jobs she applied for at Parkwest.

This conclusion is supported by Vaughn's representations to the Tennessee Department of Labor that she couldn't return to work as a floor nurse. Vaughn must provide an explanation of the inconsistency between her assertion made at the workers' compensation review that she would not be able to return to a nursing job at Parkwest, and her assertion to this court that she could perform the essential functions of a floor nurse at the time of her later applications. *See McNeill v. Wayne Cnty,* 2013 WL 665045 at *3 (where there has been a disability determination, the ADA claimant must provide a sufficient explanation for any apparent contradiction that arises out of the earlier total disability claim and the ADA claim). To defeat summary judgment, Vaughn's explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or Vaughn's good faith belief in her earlier statement of disability, she could nonetheless perform the essential functions of her job. Based on the record before the court, Vaughn has not sufficiently explained how she was qualified for a nursing job at Parkwest, with or without reasonable accommodation. An employee is deemed qualified only if she can perform all of the essential functions of her job, whether accommodated or not. 42 U.S.C. § 12111. The Seventh Circuit has held that "a person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability

10

to do the job then an ADA claim may be rejected without further inquiry." *Butler v. Village of Round Lake Police Dept,* 585 F.3d 1020, 1024 (7th Cir. 2005).

Vaughn also asserts a claim against Parkwest for failure to engage in the interactive process. An employer is required "to initiate an informal, interactive process" when necessary to determine how an employee's disability limits her ability to work and to identify appropriate reasonable accommodations. 29 C.F.R. § 1630.2. But an employer's failure to engage in the interactive process is actionable only if the employee can demonstrate that she was qualified for the position. *EEOC v. Ford,* 782 F.3d 753, 766 (6th Cir. 2015). In other words, if the employee fails to create a genuine dispute of material fact that a reasonable accommodation would have allowed her to perform the essential functions of her job, she cannot survive summary judgment on an interactive-process claim. *Id.* Because the court concludes that Vaughn has failed to make a *prima facie* showing that she was qualified for a nursing position with or without a reasonable accommodation, the court need not consider whether Parkwest failed to engage in the interactive process.

## IV. Conclusion

For the foregoing reasons, Vaughn's motion for summary judgment [R. 24] is **DENIED**; Parkwest's motion for summary judgment [R. 22] is **GRANTED;** and this action is **DISMISSED in its entirety.**

AN APPROPRIATE ORDER WILL ENTER:

_____
UNITED STATES DISTRICT JUDGE

11